NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANTHONY JACKSON,

                Plaintiff,

v.

NEW JERSEY JUVENILE JUSTICE
COMMISSION,

                Defendant.

Civil Action No. 19-17950 (SDW) (AME)

**OPINION**

January 3, 2023

**WIGENTON**, District Judge.

Before this Court is Defendant New Jersey Juvenile Justice Commission's ("Defendant") Motion for Summary Judgment ("Motion") pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendant's Motion is **GRANTED IN PART and DENIED IN PART**.

## I.     FACTUAL AND PROCEDURAL HISTORY[1]

This lawsuit arises from Plaintiff Anthony Jackson's ("Plaintiff") claims that Defendant discriminated against him on the basis of his race and religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"), and that Defendant retaliated against Plaintiff because he reported such discrimination.  (*See generally* D.E. 1.)  Plaintiff, an African American man and practicing Muslim, is employed as a Senior Correctional Police Officer ("SCPO") at Defendant's Jamesburg facility ("Jamesburg Facility"). (D.E. 48-2 ¶¶ 1, 2; D.E. 52-1 ¶¶ 1, 3–8, 15–16.)   Defendant is a New Jersey state entity headquartered in Trenton, New Jersey.  (D.E. 1 ¶ 2; D.E. 48-2 ¶ 2.)  The following events preceded the instant suit.

### A.     Plaintiff's Employment History with Defendant

---

[1] The facts presented in Defendant's Statement of Material Facts in Support of Summary Judgement (D.E. 48-2, "Defendant's Statement") are deemed undisputed for the purpose of summary judgment because Plaintiff has failed to properly contest any of the factual allegations set forth therein, as required by Local Civil Rule ("Local Rule") 56.1(a), which provides:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement [of material facts], indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.  In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. . . . Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.

L. CIV. R. 56.1(a).  Here, Plaintiff has not complied with several aspects of Local Rule 56.1(a):  "Plaintiff's Statement of Material Facts" is contained on pages three through five of Plaintiff's brief in opposition to the Motion (D.E. 49 at 3–5, "Plaintiff's Statement"); the facts contained therein neither specifically respond to nor dispute any of the paragraphs set forth in Defendant's Statement; Plaintiff's Statement does not present facts in separately numbered paragraphs; and it impermissibly contains legal argument and conclusions of law.  Accordingly, citations in this opinion are generally to the undisputed facts in Defendant's Statement and the record citations therein.  This Court will also consider the facts set forth in Defendant's Response to Plaintiff's Statement of Material Facts ("Defendant's Reply").  (D.E. 52-1.)  Even if this Court were to accept Plaintiff's non-compliant Statement, it raises few, if any, *material* disputes of fact, and the outcome of the present motion would not change.

From 2005 until 2015, Plaintiff served as an officer at the New Jersey Department of Corrections ("DOC").  (D.E. 48-2 ¶ 11; D.E. 52-1 ¶¶ 14–15.)  In 2015, Plaintiff was transferred from the DOC to serve as an SCPO at Defendant's Jamesburg Facility.  (D.E. 48-2 ¶¶ 1, 11; D.E. 52-1 ¶¶ 14–15.)  Plaintiff testified that he experienced and complained about unfair treatment at the Jamesburg Facility.  (D.E. 52-1 ¶¶ 30–31.)  Specifically, in September 2016, Plaintiff began filing written complaints about "unfair treatment" by his supervisor, Lieutenant Gene Tomsky.  (*Id.* ¶¶ 30–31.)  Plaintiff further testified that he made other written and verbal complaints throughout his employment, including complaints about the unequal training opportunities available to certain employees, the illegal presence of drugs and other contraband at the jail, and the inconsistent disciplinary actions taken against him and other employees.  (*Id.* ¶ 31.)  Indeed, between January 2017 and May 2018, Plaintiff was charged with seven disciplinary infractions— six for attendance-related violations and one "for violating an unspecified rule, regulation or policy." (D.E. 48-2 ¶ 15.)  On or about March 26, 2018, Plaintiff submitted to the EEOC a Charge of Discrimination ("Charge") against Defendant; however, Defendant did not receive it until more than one year later when the EEOC provided to Defendant a "final determination" letter on June 18, 2019.  (*Id.* ¶ 16; D.E. 48-25)

On April 2, 2018, Plaintiff was selected for a random drug test ("RDT") pursuant to Defendant's Random Drug Testing Policy ("Defendant's RDT Policy").  (D.E. 48-2 ¶¶ 12–14, 16.)  This occasion was the first time that Plaintiff had been selected for an RDT while employed at the Jamesburg Facility.  (*Id.* ¶ 12.)  On April 10, 2018, Plaintiff completed the RDT.  (*Id.* ¶ 14.)  Less than two months later, Plaintiff was selected for another RDT.  (*Id.* ¶¶ 12, 14.)  Plaintiff did not complete the second RDT allegedly due to his religious obligations during and after the Islamic Holy Month of Ramadan.  (D.E. 48-2 ¶¶ 34–45, 51–53; D.E. 52-1 ¶¶ 10–13, 22–26.)  Because

Plaintiff was unable or refused to provide a urine specimen on June 15, 2018 ("June 15 RDT"), he was immediately and indefinitely suspended from employment at the Jamesburg Facility.  (D.E. 48-2 ¶¶ 51–54; D.E. 52-1 ¶¶ 16, 28.)  The policies and circumstances surrounding the June 15 RDT are the main subjects of this litigation.

**B.      Defendant's RDT Policy**

At all times relevant to this dispute, Defendant maintained an RDT policy.  (D.E. 48-2 ¶¶ 3–4.)  Prior to 2018, Defendant was permitted—but not required—to conduct RDTs of its law enforcement personnel pursuant to the then-current Drug Testing Policy from the New Jersey Office of the Attorney General ("NJAG").  (*Id.* ¶ 4.)  In March of 2018, however, the NJAG changed course when it issued Directive 2018-2,[2] which effectively stripped all state, county, and municipal law enforcement agencies of their discretion to conduct RDTs of personnel.  (D.E. 48-2 ¶ 7.)  Directive 2018-2 mandated that all law enforcement agencies revise their RDT policies to, *inter alia*, subject all officers to the RDT process and drug test, at random, a minimum number of such officers per year—at least 10 percent in 2018 and 20 percent annually thereafter.  (*Id.*)  Moreover, Directive 2018-2 instructed agencies to ensure that their RDT policies were consistent with certain procedures set forth in the Attorney General's Law Enforcement Drug Testing Policy ("NJAG Testing Policy"), including:   Specimen Acquisition Procedures; Submissions of Specimens for Analysis; Analysis of Specimens; Drug Test Results; Consequences of a Positive Test Result; Consequences of a Refusal to Submit to a Drug Test; Resignation/Retirement in lieu of Disciplinary Action; Record Keeping; and Central Drug Registry.  (D.E. 48-17 at 22.)

In relevant part, Defendant's RDT Policy provides that "[a]ll Officers employed by [Defendant] are eligible for random drug testing, regardless of rank or assignment."  (D.E. 48-2

---

[2] *See generally* D.E. 48-17 at 20–44.

¶ 4.)  Each time Defendant conducts a random selection, it chooses "5% of those employees eligible for selection," but "[Defendant] reserves the right to change th[at] percentage."  (*Id.*)  "Once the percentage to be tested is set," the "[third-party computer] program cannot be manipulated."[3]  (*Id.* ¶¶ 4, 8.)  The program then "assign[s] a random number to each eligible employee."  (*Id.* ¶ 4.)  "The employee list [is] sorted in the ascending order of the randomly assigned number," and the "employees who fall in the specified percentage of the randomly sorted list [are] tested."  (*Id.*)  The RDT selection process is "conducted on the first business day of every month," and is "done in its entirety each and every time a selection takes place, with no regard to previous selections."  (*Id.* ¶¶ 4, 10.)  Indeed, "each and every Officer, regardless of rank or assignment, has an equal chance to be selected for drug testing each and every time a selection is conducted."  (*Id.* ¶ 4.)  This process means that the RDT program could select the same employee, at random, in consecutive RDT selections.  (*Id.* ¶ 9.)

After an individual is selected, an investigator from the Office of Investigations ("OOI") will notify the individual of his or her selection.[4]  (*Id.* ¶ 4.)  "Upon such notice, the individual . . . report[s] immediately to the area designated in order to submit a urine sample."  (*Id.*)  In accordance with the NJAG Testing Policy, Defendant's RDT Policy allowed only urine specimens to be used for drug testing.  (*Id.* ¶¶ 4–5.)  Defendant's RDT Policy mandates that "[a]n order to provide a urine sample for random drug testing is a direct order," and "[n]o Officer has the right to refuse the order or fail to provide all necessary information to complete the random drug testing

---

[3] The program user (the person who executes the computer program) is not able to "change the pool from which the program made its random selection, alter the probability a particular employee was selected by the program, or otherwise cause repeat selections."  (*Id.* ¶¶ 8–9.)

[4] The investigating officer notifies the selected individual at a later date.  Here, for example, Plaintiff was selected on June 1, 2018, but he was not made aware of his selection until June 15, 2018.  (D.E. 48-2 ¶¶ 12, 21–22; D.E. 52-1 ¶¶ 18–19.)

procedure."  (*Id.* ¶ 4.)  Moreover, "[n]o Officer has the right to delay the order for any reason."

(*Id.*)

Defendant's RDT Policy regarding the inability or refusal to produce urine—the key policy

at issue here—provides:

> Individuals that initially are unable to produce a urine specimen may
> remain under the supervision of the test monitor until the monitor is
> satisfied that the individual cannot produce a specimen.  While the
> individual is under supervision, the monitor may allow the
> individual to drink fluids in an attempt to induce the production of a
> specimen.  Failing to provide the urine specimen as required or
> leaving the specified area within an eight (8) hour time period will
> constitute a refusal.

(*Id.*; D.E. 48-10 at 7–8.)  Further, "[o]fficers who refuse to submit to a drug test ordered in response

to . . . random selection . . . will be immediately suspended from all duties."  (D.E. 48-2 ¶ 4.)

"Upon a finding that the Officer did in fact refuse to submit a sample, the Officer will be terminated

from employment with [Defendant] and permanently barred from future law enforcement

employment in New Jersey."  (*Id.*)  Defendant's RDT Policy governed the June 15 RDT and

Plaintiff's subsequent suspension.

### C.     The June 15 RDT

On June 15, 2018, between approximately 10:27 and 10:40 a.m., Plaintiff periodically

drank from a water bottle as he walked in or around the New Jersey Training School ("NJTS")

Gatehouse Lobby and a nearby parking lot.  (D.E. 48-2 ¶¶ 24–26; D.E. 52-1 ¶¶ 17–18.)  At

approximately 10:40 a.m., Plaintiff was ordered to report to the OOI.  (D.E. 48-2 ¶ 27; D.E. 52-1

¶ 18.)  At that time, Plaintiff was unaware of his selection for an RDT.  (D.E. 48-2 ¶¶ 28–29; D.E.

52-1 ¶¶ 18–19.)  At 10:42 a.m., Plaintiff—with a water bottle in his hand—arrived at OOI.  (D.E.

48-2 ¶ 29; D.E. 52-1 ¶ 17.)  Upon arrival, Investigator Gary Saraceni informed Plaintiff that he

had been selected for an RDT and that he would have to provide a urine specimen.  (D.E. 48-2

¶¶ 29–30; D.E. 52-1 ¶ 19.)  Plaintiff explained that he had just used the bathroom because he believed he was going to OOI to meet with an investigator from the New Jersey Office of Equal Employment Opportunity ("EEO").  (D.E. 48-2 ¶¶ 28, 30; D.E. 52-1 ¶¶ 18, 20.)  In accordance with Defendant's RDT Policy, Investigator Saraceni offered Plaintiff another bottle of water to help him produce a urine specimen.  (D.E. 48-2 ¶¶ 4, 31; D.E. 52-1 ¶ 23.)  Plaintiff accepted it.  (D.E. 48-2 ¶¶ 30–31; D.E. 52-1 ¶ 23.)  At 10:43 a.m., Plaintiff also signed a "Notice and Acknowledgement" form, which outlined the RDT process, Plaintiff's obligations therewith, and the consequences if Plaintiff were to test positive or refuse to test.  (D.E. 48-2 ¶¶ 47–48; D.E. 52-1 ¶ 21.)

Between 10:43 a.m. and 1:00 p.m., Investigator Saraceni observed Plaintiff consume approximately three bottles of water, totaling 50.7 fluid ounces.  (D.E. 48-2 ¶ 33; D.E. 52-1 ¶ 23.)  At 1:00 p.m., Plaintiff informed Investigator Saraceni that he might be dehydrated because of his recent fasting in observance of Ramadan.  (D.E. 48-2 ¶ 34; D.E. 52-1 ¶ 24.)  Plaintiff further explained that, due to his fast, he should not be consuming water.  (D.E. 48-2 ¶ 35.)  Investigator Saraceni advised Plaintiff that his refusal to complete the RDT within the eight-hour timeframe would result in Plaintiff's termination.  (*Id.* ¶ 49; D.E. 52-1 ¶ 26.)  Between 1:15 and 1:30 p.m., Plaintiff submitted a written statement explaining that he was "refus[ing] to complete the urinalysis" due to his "religious circumstances."  (D.E. 48-2 ¶ 36; D.E. 52-1 ¶¶ 24–26.)

At the time Plaintiff submitted his statement, he knew that Ramadan had ended, *Eid ul Fitr* ("the *Eid*") had begun on the evening of June 14, 2018, and lasted until sundown on the next day, and the tenets of Islam required him to break his fast on the *Eid*.[5]  (D.E. 48-2 ¶ 36; D.E. 52-1

_____

[5] In his deposition and his briefing to this Court, Plaintiff confirmed the following:  Ramadan is a holy period for Muslims, during which they are obligated to fast from dawn until dusk, (D.E. 52-1 ¶¶ 6–10); in 2018, Ramadan began at sundown on or about May 15, and lasted until sundown on June 14, (*id.* ¶ 9–10); the end of Ramadan is marked by another Muslim holiday called the *Eid*, a celebratory 24-hour period during which Muslims are prohibited from

¶¶ 10–13.)  Moreover, when Plaintiff submitted his statement, he still had five more hours to attempt to produce a urine specimen.  (D.E. 48-2 ¶ 36; D.E. 52-1 ¶ 24.)

Investigator Saraceni communicated up the chain of command Plaintiff's refusal to complete the RDT.  (D.E. 48-2 ¶ 39.)  At approximately 1:45 p.m., Captain Spierer arrived at OOI to reinform Plaintiff of Defendant's RDT Policy and the consequences of refusing to comply with the same.  (*Id.*)  After Captain Spierer finished reading the relevant portions of Defendant's RDT Policy, Plaintiff agreed to attempt to produce a urine specimen within the allotted time but refused to consume any more water.  (*Id.* ¶¶ 40–41.)

At approximately 5:40 p.m., and having not produced any urine specimen for the RDT, Plaintiff again declined to drink water and, instead, asked whether he could submit an alternative specimen, such as hair or blood.  (*Id.* ¶¶ 41–42.)  Investigator Saraceni informed Plaintiff that Defendant's RDT Policy did not allow for such alternative means of drug testing.  (*Id.* ¶ 43.)  At approximately 6:45 p.m., Investigator Saraceni advised Plaintiff that the eight-hour timeframe for the RDT had ended and asked Plaintiff if he would be able to produce any urine specimen for the RDT.  (*Id.* ¶ 44.)  Plaintiff confirmed that he could not do so, but he requested an extension until 8:30 p.m., at which time he would resume drinking water "and try then to [produce] a sample." (*Id.*; D.E. 52-1 ¶ 27.)  Investigator Saraceni relayed Plaintiff's extension request up the chain of command, but Assistant Chief Flora rejected it.  (D.E. 48-2 ¶ 45; D.E. 52-1 ¶ 28.)  As a result, Plaintiff's employment was immediately suspended, pending termination upon a finding that he did in fact refuse to submit a specimen in accordance with Defendant's RDT Policy.  (D.E. 48-2 ¶ 51; D.E. 52-1 ¶ 28.)  Plaintiff remains on indefinite suspension today.  (D.E. 48-2 ¶ 54.)

---

fasting, (*id.* ¶ 13; D.E. 48-2 ¶ 19); in 2018, the *Eid* began at sundown on June 14, and lasted until sundown on June 15, (D.E. 52-1 ¶ 13); Plaintiff did not have a religious obligation to fast on June 15, 2018, (*id.* ¶ 11); and Plaintiff made a "personal choice" to "continue [his] fast [on the *Eid* in 2018] based on days that [he] missed" during Ramadan, because he believed he was "obligated" to make up for those missed days "at his discretion."  (*Id.* ¶¶ 11–13.)

### D.      Procedural History

Plaintiff initiated the instant suit on September 12, 2019, in this Court.  (D.E. 1.)  Plaintiff's Complaint alleges that Defendant discriminated against him on the basis of his religion in violation of Title VII and NJLAD (Count One), that Defendant discriminated against him on the basis of his race in violation of the same (Count Two), and that Defendant retaliated against him for engaging in a protected activity—filing complaints regarding inconsistent treatment by Defendant (Count Three).[6]   (*Id.* ¶¶ 1–38.)   Following discovery, Defendant filed the instant Motion for Summary Judgment, and the parties timely completed briefing.  (D.E. 48, 49, 52.)

## II.      <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The dispute is not genuine if it merely involves "some metaphysical

---

[6] In his Opposition Brief, Plaintiff raises an entirely new claim—that Defendant's RDT Policy violated his right to due process.  (D.E. 49 at 2.)  Plaintiff alleges that "Defendant failed to order a doctor's examination as the right warranted by the [NJAG] policy, thus, stripped Plaintiff's right of due process of law. . . ."  *Id.*  This Court will not address Plaintiff's untimely due process claim because "Plaintiff raised no such claims or factual allegation in [his] Complaint, and may not amend [his] complaint through factual allegations raised in an opposition brief."  *Medley v. Atl. Exposition Servs.*, 550 F. Supp. 3d 170, 187 (D.N.J. 2021); *see also Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996))).

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing FED. R. CIV. P. 56(e)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his [or her] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. In deciding the merits of a party's motion for summary judgment, the court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat

summary judgment simply by asserting that certain evidence submitted by the moving party is not credible.  *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002) (citing *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998)).

## III.   <u>DISCUSSION</u>

Under Title VII and the NJLAD, employers are prohibited from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment, on the basis of race or religion.  42 U.S.C. § 2000e-2(a)(1); N.J. STAT. ANN. § 10:5-12(a).  Title VII and the NJLAD further forbid employers from failing to reasonably accommodate an employee's sincerely held religious beliefs.  42 U.S.C. § 2000e(j); N.J. STAT. ANN. § 10:5-12(q)(1).  Here, Plaintiff raises multiple claims sounding in discrimination and retaliation.  (*See generally* D.E. 1.) Specifically, Plaintiff claims that Defendant discriminated against him on the basis of his race and religion by treating similarly situated non-African American and non-Muslim employees more favorably (disparate treatment); that Defendant discriminated against him on the basis of his religion by refusing to accommodate his religious beliefs during the June 15 RDT (failure to accommodate); and that Defendant retaliated against Plaintiff because Plaintiff submitted complaints of discriminatory treatment at the Jamesburg Facility.  (*See generally* D.E. 1.)  Because the analyses for the Title VII and NJLAD claims largely overlap, where applicable, the Court will analyze such claims together.

### A.  Disparate Treatment[7]

---

[7] Plaintiffs "may assert two theories of religious discrimination: 'disparate treatment,' . . . and 'failure to accommodate.'"  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001).  Here, Plaintiff brings claims for disparate treatment—because he was allegedly treated differently from other non-African American and non-Muslim employees—and for failure to accommodate—because Defendant did not extend the RDT by two hours. Courts review disparate treatment claims differently from failure to accommodate claims.  *Id.* at 281–82 n.12.

"Courts evaluate motions for summary judgment on Title VII and NJLAD claims under a specialized burden-shifting regime," which is largely based on the Supreme Court's decision in *McDonnell Douglas v. Green*.[8]  *Ewell v. NBA Props.*, 94 F. Supp. 3d 612, 620 (D.N.J. 2015). Under the *McDonnell Douglas* analysis, (1) a plaintiff is "required to establish a prima facie case of discrimination"; then (2) once a plaintiff successfully establishes a prima facie case, an inference of discrimination is created and the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its adverse employment decision"; and then (3) if the defendant successfully articulates such a reason, "the burden of production returns to the [plaintiff], who is then required to show that the employer's proffered reason was actually a pretext for discrimination."  *Arenas v. L'Oreal USA Prods.*, 461 F. App'x 131, 133 (3d Cir. 2012).

The first step in the *McDonnell Douglas* framework is the same for Plaintiff's racial and religious disparate treatment claims:   "[a] plaintiff must state a prima facie claim of discrimination."  *Ewell*, 94 F. Supp. 3d at 620 (citing *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)).

> A prima facie case of . . . discrimination encompasses four elements: 1) the plaintiff belonged to a protected class; 2) he was qualified for the position in question; 3) he was subject to an adverse employment action; and 4) the adverse action was taken under circumstances giving rise to an inference of discrimination.

*Id.* (collecting cases); *see also Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (applying same first step of the *McDonnell Douglas* framework to claims of disparate treatment on the basis of race and religion under the NJLAD); *Tisby v. Camden Cnty. Corr. Facility*, 152 A.3d 975, 980–81 (N.J. Super. Ct. App. Div. 2017) (applying same first step of the *McDonnell Douglas* framework to claims of disparate treatment on the basis of religion).

---

[8] 411 U.S. 792, 802 (1973).

Once the plaintiff meets this initial burden, "the burden [of production] shifts to the defendant-employer to articulate legitimate, non-discriminatory reasons for the employment decision." *Ali*, 957 F.3d at 180; *accord Ewell*, 94 F. Supp. 3d at 620.  The defendant's burden is "relatively light."  *Arenas*, 461 F. App'x at 133.  That is, the defendant need only provide "evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Ewell*, 94 F. Supp. 3d at 620 (quoting *Burton*, 707 F.3d at 426).

If the defendant successfully articulates a legitimate, non-discriminatory reason for its decision, "the burden shifts back to the plaintiff, who must show through direct or circumstantial evidence that the legitimate, non-discriminatory reason given is merely pretext and the protected status of the plaintiff was the determinative factor of the adverse employment action." *Ali*, 957 F.3d at 180 (citing *Makky v. Chertoff*, 541 F.3d 205, 214–20 (3d Cir. 2008)).  Put differently, the plaintiff must either (1) "discredit defendant's proffered reason," or (2) demonstrate "that discrimination was more likely than not a motivating or determinative factor in the adverse action." *Ewell*, 94 F. Supp. 3d at 620 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

1.    Prima Facie Case

When viewing the facts in the light most favorable to Plaintiff, his claims for disparate treatment on the basis of race and religion fall short.  Although Plaintiff has arguably proven that he belonged to a protected class, he was qualified for the position in question, and he was subject to an adverse employment action, he has not satisfied the fourth element of his disparate treatment claims—that the adverse employment action gave rise to an inference of discrimination on the basis of race or religion.  *See id.*

The undisputed facts show that Plaintiff is an African American man and a practicing Muslim (D.E. 48-2 ¶ 1; D.E. 52-1 ¶¶ 1, 3–7); he worked at the DOC from 2005 until 2015 and

then at Defendant's Jamesburg Facility from 2015 until 2018 (D.E. 48-2 ¶ 11; D.E. 52-1 ¶¶ 14–16); and he was indefinitely suspended after the June 15 RDT, (D.E. 48-2 ¶¶ 51–54; D.E. 52-1 ¶¶ 16, 28).   The record, however, is absent of any specific facts from which an inference of discrimination can be discerned from Plaintiff's suspension.  Plaintiff has presented no evidence showing that he was selected for the RDT because of his race or religion; that the RDT selection process was otherwise flawed or rigged; that anyone involved in the RDT process discriminated against him because of his race or religion; or that he was suspended because of his race or religion.  In other words, Plaintiff has not presented any evidence to establish a causal nexus between his suspension and his race or religion.  *See Greene v. Va. Islands Water & Power Auth.*, 557 F. App'x 189, 196 (3d Cir. 2014) ("[Plaintiff] otherwise failed to produce evidence that could give rise to an inference of discrimination because the evidence that he produced could not establish a causal nexus between the termination of his employment and his membership in the protected class.").

Plaintiff argues that an inference of discrimination can be drawn by comparing Defendant's treatment of him with Defendant's treatment of Angelina Ruiz, a non-African American and non-Muslim officer who allegedly tested positive for a drug.  (D.E. 52-1 ¶ 29.)  However, despite lengthy discovery, Plaintiff has failed to provide any evidence to establish Officer Ruiz as a valid comparator.  "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant aspects."  *Ewell*, 94 F. Supp. 3d at 624 (citing *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011)).  Courts will "consider whether the plaintiff and the comparator had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct."  *Id.*  Here, Plaintiff has not presented any evidence regarding Officer Ruiz's race, religion, job responsibilities, or supervisors.  Even if this Court were to accept Plaintiff's assertions regarding Officer Ruiz's characteristics, Officer

Ruiz still would not be a valid comparator because Plaintiff has not provided any evidence regarding the policies, procedures, and circumstances surrounding Officer Ruiz's alleged drug test. Plaintiff's statements about Officer Ruiz and her alleged drug test—unsupported by any admissible evidence—fall woefully short of the requirement that Plaintiff offer "apt and clear" comparator employees who are "similarly situated [to Plaintiff] in all relevant respects." *Id.* (citing *Wilcher*, 441 F. App'x at 881–82).

Because Plaintiff has not provided admissible evidence to prove that the circumstances surrounding his suspension give rise to an inference of discrimination, this Court is left with only Plaintiff's bare assertions, subjective beliefs, and conclusory allegations of discrimination.[9]  Such contentions, without more, are not sufficient to establish an inference of discrimination.  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 843–44 (3d Cir. 2016) ("[Plaintiff] has not presented specific facts or identified evidence, beyond her own bare assertions, that would support her disparate treatment theory of discrimination."); *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014) (explaining that "subjective belief that [protected classification] played a role in these employment decisions, however, is not sufficient to establish an inference of discrimination.").  Put simply, "speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." *Paradoa v. Phila. Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015).  Plaintiff presents

---

[9] For example, Plaintiff's Opposition Brief asks, "[W]hy would [Defendant] afford a non-African American Officer the chance to redeem, but not g[i]ve Plaintiff the same?  It is a strong inference of discrimination," (D.E. 49 at 12–13); and argues, "Defendant failed to order a doctor's examination as the right warranted by the [Attorney General's] policy, thus, stripped Plaintiff's right of due process of law and gives rise to an inference of discrimination due to Plaintiff's race and previous dealings with [Defendant]."  (*Id.* at 6.)  However, Plaintiff neither cites any evidence in the record to establish that Plaintiff and Officer Angelina Ruiz were similarly situated, nor offers any evidence that connects his June 15, 2018 suspension to his previous complaints of discrimination.

no evidence from which an inference of discrimination can be drawn, and therefore he has failed to establish a prima facie showing of disparate treatment on the basis of his race or religion.

### 2.   Pretext

Even if Plaintiff had established a prima facie case of disparate treatment on the basis of race or religion, he has failed to rebut Defendant's proffered non-discriminatory reasons for Plaintiff's June 15 RDT and subsequent suspension.   Once Plaintiff establishes his prima facie case of disparate treatment, a "relatively light" burden shifts to Defendant to provide a legitimate, non-discriminatory reason for the employment decision." [10]   *Ali*, 957 F.3d at 180; *Ewell*, 94 F. Supp. 3d at 620.  Here, Defendant has met its burden.

Defendant sets forth—and the undisputed facts establish—that in March 2018, the NJAG introduced a policy that mandated a minimum number of random drug tests be conducted at all state and local law enforcement agencies in New Jersey, (D.E. 48-2 ¶ 7); that Plaintiff was twice randomly selected for drug tests in 2018, (*id.* ¶ 12); that Plaintiff was selected by using a third-party computer program, with which Defendant did not—and could not—tamper, (*id.* ¶¶ 4, 8–9); that Plaintiff's June 15 RDT was on the *Eid*, an Islamic holy day on which people are required to feast, rather than fast, (*id.* ¶¶ 19–20); that Investigator Saraceni witnessed Plaintiff drink three bottles of water, totaling approximately 50.7 fluid ounces between 10:42 a.m. and 1:00 p.m. on June 15, 2018, (*id.* ¶¶ 27, 29, 31, 33–34); that Plaintiff refused to drink any more water after 1:00 p.m. on June 15, 2018, because he claimed to be fasting (*id.* ¶¶ 34–35); that shortly thereafter, Plaintiff provided a written statement, in which he "informed [Investigator Saraceni] of [Plaintiff's] refusal to complete the urinalysis," even though he had five more hours to produce the

---

[10] Importantly, because Plaintiff did not establish a prima facie case, this Court need not reach step two of the analysis—that Defendant provide a legitimate, nondiscriminatory reason for Plaintiff's termination.  In the interest of thoroughness, however, this Court will briefly discuss the remaining steps of the *McDonnell-Douglas* burden-shifting analysis.

specimen, (*id.* ¶ 36); and that, by 6:45 p.m. on June 15, 2018, Plaintiff was unable to provide a urine specimen within the eight-hour timeframe allotted for drug tests, and he was immediately suspended pursuant to Defendant's RDT Policy, (*id.* ¶¶ 36–45, 51–53).

In short, Defendant alleges that it followed the NJAG's Directive and its RDT Policy, (*id.* ¶¶ 3–9), Plaintiff failed to comply therewith, (*id.* ¶¶ 24–45), and therefore Plaintiff was immediately suspended from his employment, (*id.* ¶¶ 51–54). Defendant's reason, if accepted as true, supports a conclusion that it suspended Plaintiff for a legitimate, nondiscriminatory reason.

If the analysis were to proceed, Plaintiff would have to meet the burden of demonstrating pretext under the *McDonnell Douglas* framework. Plaintiff, then, must either (1) "discredit" Defendant's reason or (2) demonstrate that discrimination was a motivating or important factor in the adverse employment action. *Ewell*, 94 F. Supp. 3d at 620 (citing *Fuentes*, 32 F.3d at 764). A plaintiff who chooses the first method must "cast doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996). The plaintiff may "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence. . . .'" *Fuentes*, 32 F.3d at 764–65 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff who chooses the second method "may show that the employer has previously discriminated against h[im], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, at 644–45 (3d Cir. 1998) (quoting *Fuentes*, 32 F.3d at 765).

Here, Plaintiff attempts to demonstrate pretext by asserting unsupported and conclusory assertions to contest the logic of Defendant's decision.  (D.E. 49 at 15–16).  He offers dissimilar and undefined comparators, (*id.* at 9, 15–16; D.E. 52-1 ¶ 29), and generally alleges that Defendant had previously subjected him to unlawful discriminatory treatment, (D.E. 49 at 9–11; D.E. 52-1 ¶ 30–31).

First, Plaintiff argues that Defendant's eight-hour time limit, instead of a 10-hour time limit, "is a pretext and a cover for discrimination."  (D.E. 49 at 15).  Specifically, Plaintiff contends that the eight-hour time limit in Defendant's RDT Policy was unreasonable and ambiguous, and that Defendant abused such ambiguity to punish Plaintiff.  (*Id.*)  Plaintiff's argument, however, "has not succeeded in throwing enough doubt on" Defendant's proffered reasons.  *Fuentes*, 32 F.3d at 766.  When read as a whole, Defendant's RDT Policy regarding the eight-hour timeframe is clear:  Plaintiff had eight hours to complete the RDT.[11]  Further, Plaintiff was advised of and acknowledged the eight-hour time limit in Defendant's RDT Policy—and he agreed to comply therewith.  (D.E. 48-2 ¶¶ 39–40; D.E. 48-13 at 11.)  In any event, Plaintiff has offered no evidence whatsoever to establish that Defendant's eight-hour time limit was unreasonable or that the time limit was discriminately enforced against Plaintiff.  Plaintiff has not sufficiently "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reason[] for its action," and therefore Plaintiff has not established pretext.  *Fuentes*, 32 F.3d at 765 (citing *Ezold*, 983 F.2d at 531).

Second, Plaintiff contends that Defendant's more favorable treatment of Officer Ruiz indicates pretext.  (D.E. 49 at 15–16; D.E. 52-1 ¶ 29.)  As this Court has already explained, Plaintiff

---

[11] In relevant part, Defendant's RDT Policy states:  "Failing to provide the urine specimen as required or leaving the specified area within an eight (8) hour time period will constitute a refusal."  (D.E. 48-10 at 7–8.)

has not proven that Officer Ruiz is a valid comparator.[12]  Plaintiff has not presented any *admissible* evidence to show Officer Ruiz's race, religion, or job responsibilities; whether Officer Ruiz was tested pursuant to Defendant's RDT Policy or another policy; when or whether Officer Ruiz tested positive for a drug, and if so, for what drug; and when or whether Officer Ruiz remedied the positive drug test result.  Without that information, Plaintiff cannot establish Officer Ruiz as similarly situated in all aspects, and therefore, Officer Ruiz cannot be used a valid comparator to establish pretext.  *See Ewell*, 94 F. Supp. 3d at 624–27 (explaining that comparator employees must be "similarly situated employees of a different [protected class, who] received more lenient treatment than that afforded plaintiff").

Third, Plaintiff insists that his complaints of unequal treatment since 2016, "put together [with] all the other incidents," establish pretext, (D.E. 49 at 10–11); and that "bad blood had built up for years . . . [and t]he finding of refusal [to produce a urine specimen] is a perfect reason for Defendant to get rid of Plaintiff,"  (*id.* at 7).  Once again, Plaintiff has not presented evidence sufficient to support these assertions.  Plaintiff testified that, since September 2016, he had filed complaints about unequal treatment at the Jamesburg Facility.  (D.E. 52-1 ¶¶ 30–31.)  Besides his own testimony, however, Plaintiff has not submitted evidence of his past complaints of discrimination.  (*Id.*)  Moreover, many of the alleged past complaints referenced in Plaintiff's testimony do not relate to discrimination on the basis of a protected classification.  Rather, Plaintiff's underlying complaints relate to favoritism for certain employees over others.[13]  Unfair as it may be, a supervisor's preferential treatment for peers, long-time colleagues, and personal

---

[12] *See supra* Section III.A.1.

[13] For example, Plaintiff complained of unfair treatment because his supervisor enforced rules and policies against him, while "[such rules and policies] were not enforced for the same violations for guys that were either his peers, worked with him longer, guys that went on his personal trips, you know, personal outings."  (D.E. 48-8 at 159:2–9.)

friends—without any evidence of discriminatory intent—does not amount to pretext.  *See Patterson v. AFSCME # 2456*, 320 F. App'x 143, 147 (3d Cir. 2009) ("[E]very Title VII plaintiff must demonstrate, *inter alia*, that she suffered discrimination based upon her membership in a class protected under Title VII.").

Because Plaintiff has not presented evidence of past *unlawful* discrimination, he has not established pretext.  *See Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 651 (D.N.J. 2002), *aff'd*, 95 F. App'x 462 (3d Cir. 2004) ("Pretext cannot be established based on speculation and mere conclusory allegations").  Further, Plaintiff cannot prove past unlawful discrimination or pretext where, as here, "[h]e only points to his self-serving . . . testimony and subjective beliefs and speculations that Defendant[] engaged in . . . discrimination."  *Sutton v. Bd. of Educ. of Plainfield*, No. 13-5321, 2015 WL 9308251, at *8 (D.N.J. Dec. 22, 2015); *see also Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) ("[C]onclusory, self-serving affidavits [and testimony] are insufficient to withstand a motion for summary judgment . . . . In this case, [Plaintiff's] own, sworn statements are insufficient to survive summary judgment.").[14]

Plaintiff has neither established a prima face case nor pretext, and therefore his claims for disparate treatment on the basis of race and religion fail.

### B.  Failure to Accommodate

Issues of material fact still exist with respect to Plaintiff's claim that Defendant failed to accommodate his religious beliefs when denying his request for an accommodation.  The relevant provisions of Title VII and NJLAD make it unlawful for employers to impose upon an employee

---

[14] Plaintiff claims that he heard other coworkers call him a racial slur, (D.E. 52-1 ¶ 32), and, in his complaint, states that "the EEOC Final Determination found a violation of Title VII of the Civil Rights Act of 1964," (D.E. 1 ¶ 12). However, the only evidence in the record shows that the alleged racial slur occurred prior to Plaintiff's employment with Defendant, and that Defendant had no notice of the EEOC Charge—and thus did not dispute it—until June 2019, one year after Plaintiff's RDT.

a condition of employment that burdens the employee's religious observance or practice.  *See* 42 U.S.C. § 2000e(j); N.J. STAT. ANN. § 10:5-12(q)(1).   To establish a claim for failure to accommodate religious beliefs, a plaintiff "must show that he:  (1) holds a sincere religious belief that conflicts with a job requirement; (2) informed his employer of the conflict; and (3) was disciplined for failing to comply with the conflicting job requirement."  *Groff v. DeJoy*, 35 F.4th 162, at 168 (3d Cir. 2022) (citing *EEOC v. GEO Grp.*, 616 F.3d 265, 271 (3d Cir. 2010)).   Once the plaintiff establishes a prima facie case, "the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business."  *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009).   New Jersey courts engage in a similar analysis under the parallel provision of the NJLAD.  *See, e.g., Tisby*, 152 A.3d at 248–50 (explaining that "[u]nder the [NJ]LAD, employers cannot impose any condition upon employees that 'would require a person to violate . . . sincerely held religious practice or observance'" (third alteration in original) (quoting N.J. STAT. ANN. § 10:5-12(q)(1))).

Here, Defendant argues that Plaintiff has failed to establish a bona fide religious belief because Plaintiff's individual practices conflicted with the central tenets of Islam.  (D.E. 48-2 ¶¶ 19–20, 23, 36–38.)  Defendant contends that "[i]t is undisputed Jackson was under no religious obligation to fast on June 15, 2018," and "[i]n fact, Jackson's religion actually prohibited him from fasting on that day."  (*Id.*; D.E. 48-3 at 11–12.)  But Defendant misconstrues the extent to which this Court may inquire into the veracity of Plaintiff's religious practices on a motion for summary judgment.  *See Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 137 (3d Cir. 1986) ("[C]ourts may not inquire into the verity of a religious belief, [but] 'it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity of someone's religious beliefs in both

the free exercise context, and the Title VII context.'" (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd*, 479 U.S. 60 (1986))).  Courts may look to whether "beliefs are sincerely held and whether they are, in [the plaintiff's] own scheme of things, religious." *Fallon v. Mercy Catholic Med. Ctr. of S.E. Penn.*, 877 F.3d 487, at 490–91 (3d Cir. 2017) (quoting *United States v. Seeger*, 380 U.S. 163, 165 (1965)).  Courts must tread carefully, though, as "it is not within the judicial function and judicial competence to inquire whether the [plaintiff] . . . correctly perceived the commands of [his] . . . faith." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981); *see also Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990) ("[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").

Few courts within New Jersey and the Third Circuit have engaged in great depth with this inquiry.  Those that have done so have explained "the determination of sincerity is a subjective inquiry, requiring examination of '"an individual's inward attitudes towards a particular belief system" in which a person's claim "that his belief is an essential part of a religious faith must be given great weight."'" *Matos v. PNC Fin. Servs. Grp.*, No. 03-5320, 2005 WL 2656675, at *4 (D.N.J. Oct. 17, 2005) (quoting *Bailey v. Associated Press*, No. 01-4562, 2003 WL 22232967, at *7 (S.D.N.Y. Sept. 29, 2003)).  "[S]ubjective intent is a question of fact," which ordinarily should not be disposed of on a summary judgment motion.  *Peterson v. Crown Fin. Grp.*, 661 F.2d 287, 291 (3d Cir. 1981).  Courts should be hesitant to grant motions for summary judgment in which questions of subjective intent arise.  *Robertson v. Central Jersey Bank & Tr. Co.*, 47 F.3d 1268, 1279 n.12 (3d Cir. 1995) (citing *Shanley & Fisher, P.C. v. Sisselman*, 521 A.2d 872, 878 (N.J. Super. Ct. App. Div. 1987)).  Unsurprisingly, "in religious accommodation cases such as this, [summary judgment] should be granted only where '[o]n the record before the Court, a reasonable

jury could only conclude that [the employee's] religious assertion was not bona fide.'"  *Matos*, 2005 WL 2656675, at *4 (quoting *Hussein v. Waldorf-Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (second and third alterations in original)); *see also Sistrunk v. Camden Cnty. Workforce Inv. Bd.*, No. 05-1506, 2007 WL 1175701, at *3 (D.N.J. Apr. 18, 2007).

Here, Defendant has presented several undisputed facts that suggest Plaintiff's beliefs are not sincerely held.[15]  For example, Plaintiff admitted that at sundown on June 14, 2018, Ramadan had ended, (D.E. 48-2 ¶¶ 18–20, 36); the *Eid* had begun on June 14, 2018, and lasted until sundown on June 15, 2018, (*id.* ¶¶ 19–20; D.E. 52-1 ¶ 13); during the *Eid*, he was required to feast—rather than fast, (D.E. 48-2 ¶¶ 19–20; D.E. 52-1 ¶¶ 11, 13); and it was against the tenets of Islam for him to fast, (D.E. 48-2 ¶¶ 36–38; D.E. 52-1 ¶¶ 11–13).  Plaintiff, however, believed that "his religious obligations during Ramadan [we]re discretionary and that, on 4 to 5 days during Ramadan in 2018, he decided to break his fast before dusk and was 'obligated' to make up those days 'at his discretion' after Ramadan ended."  (D.E. 48-2 ¶ 37; D.E. 52-1 ¶¶ 7, 12.)  Plaintiff claimed to have "made a 'personal choice' to 'continue [his] fast [on the *Eid* in 2018] based on days that [he] missed' during Ramadan."  (D.E. 48-2 ¶ 38; D.E. 52-1 ¶¶ 11, 22.)  Further, Plaintiff informed Investigator Saraceni of Plaintiff's make-up days for his fasting in the middle of the June 15 RDT.  (D.E. 48-2 ¶¶ 35–36; D.E. 52-1 ¶ 25.)   Although the timing and circumstances surrounding Plaintiff's invocation of his discretionary fast could be questioned, when viewing the facts in the light most favorable to Plaintiff's subjective intent, a reasonable juror could find that his religious beliefs were sincerely held and that his practice of making up fasting days comported with his sincerely held beliefs.

---

[15] Indeed, in several instances, Plaintiff affirmatively agreed with Defendant that his beliefs were against the tenets of Islam.  *See, e.g.,* D.E. 52-1 ¶ 11 ("Even though Plaintiff did not have a religious obligation to fast on June 15, 2018, he decided to use June 15, 2018, as one of the days to make up the missing days he had during Ramadan.").

Plaintiff must then establish that he informed his employer of the conflict and that he was disciplined for not complying with the policy.  By 1:30 p.m. on June 15, 2018, Plaintiff informed Investigator Saraceni of the conflict between his religious beliefs and his ability to complete the RDT within eight hours.  (D.E. 48-2 ¶¶ 34–36; D.E. 52-1 ¶¶ 24–26.)  Thereafter, Plaintiff requested an accommodation—an extension to 8:30 p.m.—so that he could resume drinking water after his fast ended at sundown.  (D.E. 48-2 ¶ 44; D.E. 52-1 ¶ 27.)  Plaintiff's request was denied, and he was suspended for failing to complete the RDT.  (D.E. 48-2 ¶¶ 45–46; D.E. 52-1 ¶ 28.)  Plaintiff has thus established the second and third elements of his prima facie case.  The burden then shifts to Defendant to show it made reasonable accommodations, or that an accommodation would create an undue hardship.  *See Webb*, 562 F.3d at 259.  Defendant has not proffered either, and therefore summary judgment must be denied with respect to Plaintiff's claim for failure to accommodate his religious beliefs.

### C.  Retaliation

To establish a prima facie case of retaliation under NJLAD, Plaintiff must show that "(1) [he] engaged in a protected activity known by the employer; (2) thereafter [his] employer unlawfully retaliated against [him]; and (3) [his] participation in the protected activity caused the retaliation." *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 141 (N.J. 2008) (citing *Craig v. Suburban Cablevision, Inc.*, 660 A.2d 505, 508 (N.J. 1995)); *accord Abramson*, 260 F.3d at 286. Here, Plaintiff has not shown a causal link between his protected activities and his suspension.

"In determining whether a plaintiff has produced prima facie evidence of causation, the decisions of our Court of Appeals have generally focused on two indicia:  timing and evidence of ongoing antagonism." *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 424 (D.N.J. 2003) (citing *Kachmar v. Sungaurd Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997)).  The temporal proximity of

an employee's protected activity and the employer's adverse employment action, by itself, will not establish a prima facie case of retaliation, unless it is "unusually suggestive." *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)); *accord Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073 (N.J. Super. Ct. App. Div. 2005) ("Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation."). "In the absence of such a close temporal proximity, [courts] consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015). Evidence besides temporal proximity and antagonism may be considered to establish causation. *See Hargrave*, 262 F. Supp. 2d at 425 ("[T]he case law has set forth few limits on the type of evidence which might suffice to establish a prima facie showing of causation." (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000))).

Here, Plaintiff alleges that Defendant suspended him because of his complaints about discrimination at the Jamesburg Facility since September 2016, including, most recently, the Charge he filed with the EEOC on or about March 26, 2018. (D.E. 48-2 ¶ 16; D.E. 52-1 ¶¶ 30–31.) At bottom, Plaintiff asserts that the temporal proximity between his complaints of discrimination and his RDTs is unusually suggestive, and thus, he alleges, an inference of causation is created by temporal proximity alone. (D.E. 49 at 17–18.) Importantly, however, the undisputed evidence in the record shows that Defendant was not aware of the Charge filed with the EEOC until June 2019—over one year after Plaintiff filed it and one year after Plaintiff's suspension. (D.E. 48-2 ¶ 16.) Moreover, the undisputed evidence in the record establishes that

the RDT selection process was in fact random.  (*Id.* ¶¶ 4, 8–9).  In sum, Plaintiff has not presented admissible evidence linking any of his complaints between September 2016 and March 2018 to his suspension in June 2018.  Therefore, there is no evidence from which a reasonable factfinder could conclude that Defendant had knowledge of Plaintiff's protected activities and, in turn, retaliated against him.  Consequently, Plaintiff's retaliation claim must fail.  *See, e.g., Barroso v. Lidestri Foods, Inc.*, 937 F. Supp. 2d 620, 638 (D.N.J. 2013).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order follows.

_____/s/ Susan D. Wigenton_____<br>
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:        Clerk<br>
cc:          André M. Espinosa, U.S.M.J.<br>
             Parties